The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. All right. Miss Sahara. Good morning. Good morning. Good morning, Counselor. You may proceed when you're ready. Shall I proceed? Oh, yes, you may, please.    The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good morning.  I'm here to make a brief comment. This is not an appropriate case for relief under the high standard of Rule 59e. Aime alleged in his counterclaims in this very case that Liberty failed to pay rent on his properties. The parties went to trial on those allegations at which Aime proved up his claimed damages. Due to his own lack of diligence, it turns out, he missed certain categories of his damages. Rule 59e is not intended to give litigants in these circumstances a second bite at the apple, and the district court abused its discretion in holding to the contrary. Now, I think there's two fundamental flaws in the court's ruling below, either one of which suffices for reversal. First, the court failed to take account of material factors relevant to whether Aime exercised diligence by focusing exclusively on whether he could have discovered the landlord proceedings and not the unpaid rent itself. And second, the court erroneously excluded the document showing that Aime was on notice of the landlord proceedings. If I may, let me start with the issue of diligence, because I think that's the easiest way for the court to resolve the appeal. The court failed to take account of material factors relevant to the inquiry of whether Aime could have discovered his claimed damages by exercising diligence. The newly discovered evidence in this case is the unpaid rent on the Burnside property, but the court simply failed to analyze whether Aime could have done something to discover that unpaid rent. It instead focused its analysis only on whether he was actually on notice of the landlord proceedings. And that exclusive focus on those proceedings caused the court to not consider the broad range of things that Aime could have done to discover the unpaid rent. First of all, Aime was undoubtedly on notice of the possibility that rent was not being paid at that property. That was, after all, his allegation in this case. It was also his allegation, which he made under penalty of perjury. Ms. Zaharia, when you say that was his allegation in this case, you mean to say, I think, that he made a broad allegation regarding unpaid rents, not that he identified the Burnside property expressly as part of his claim. Is that right? Correct. Well, he made the allegation as to all of his properties. There were, I think, eight or nine properties, but he did not specifically tie that allegation, in this case, to the Burnside property. He just made it broadly as to all the properties. That by itself, I don't think, would be enough, right? There has to be something more to suggest that he either knew or should have known that was part of the universe of the outstanding rent payments that were due on his property. So what is that? Well, there's several things. First of all, there's the allegation that he made under penalty of perjury in the New had failed to pay rent on the Burnside property itself. So can I ask you about that? So I know the district court judge in this case made some rulings regarding the authenticity of certain documents in those New York proceedings, and he stuck to the black letter of the law that he believed required a certification from the clerk of court. But were there any subset of those documents that were admitted into the record without objection so that, and if so, can you point us to that subset of documents that actually shows actual notice? The judge simply refused to consider all of those documents on the ground that they didn't have a certification attached to them. He did not admit any of those documents as part of his consideration of this motion. Not even the complaint? Not even the complaint in the state court? Well, he did consider, of course, the landlord judgment itself, because AIM attached that to his motion, and he did consider the judgment. I don't recall whether he considered the complaint. He did not consider AIM's complaint alleging that Liberty had failed to pay rent on the Burnside property. But even putting aside the New York proceedings, of course, this case was about the rent. And there was also testimony at trial from AIM's former employees to the effect that Liberty was not paying rent at the properties generally. They did not specify which properties they were talking about. And then there was the fact that AIM himself acknowledged that Liberty was not paying rent on various properties because he paid the rent himself on some of the properties and then sought reimbursement from Liberty for that rent. Now all of this should at least have put him on inquiry notice that he should do something to ascertain the status of the rent on the Burnside property, which was part of this case after all. And he remained the lessor on that lease. Figuring out the status of the rent was as simple as picking up the phone and calling his landlord, which apparently he never did. He admitted at trial. Yes, Your Honor. You say he... I mean, I just want to make sure I understand the context here. He has the burden to prove due diligence and you keep saying what he did or didn't do. Did he put forward evidence proving what he did or didn't do, that he didn't make that phone call? He put forward no evidence, Your Honor. No evidence about what he did. That's what I'm asking. When you say he apparently didn't make that call, like he had the burden to prove due diligence. I get the presumption here is that he either didn't make the call or he's lying about having, you know, that he didn't know. But we actually have to have proof of that, right? Don't we? Exactly, Your Honor. It is his burden to prove diligence. And all that he did was attach an act to David or a declaration to his motion in which he stated he didn't know about the judgment against him. And that's it. That's all that's in the record about what he did. Nothing about whether he called the landlord. Nothing about what he did in discovery in this case to try to prove his claims. These were his claims. He had the burden of proof to prove his damages. He didn't ask Liberty and interrogatories about unpaid rent. He didn't ask at depositions. He didn't ask at trial. He didn't serve requests for admissions. He didn't do any of that. All that he can point to, and I think this is actually quite important, is he points to a document request that asked about rent. And he says Liberty didn't produce any documents about rent. It is true that Liberty did not produce information showing rent payments during the period that is relevant to this motion, which was May 2016 and on. But Liberty was actually very candid at trial about why it had failed to produce that information. This is at JA 509 to 510. There's a colloquy between the court and Liberty about why Liberty had not produced any documents showing rent payments or other expenses after April of 2016. And Liberty explained that that was because it wasn't paying the expenses after April of 2016. So if that didn't put AIM on notice that he had a claim for rent at this property after April 2016, I don't know what would have put him on notice.  He also points to an exhibit that was prepared and presented at trial as an agreed exhibit. Just to be clear, that is his exhibit. He prepared it. And it's a summary exhibit of his claimed rent damages. And the parties just stipulated to a number of exhibits that could be presented without objection at trial. But there's no representation in that exhibit from Liberty that that is the total universe of AIM's claimed damages, nor would it even know what the total universe of AIM's claimed damages was because it wasn't possessing this property at the time and wouldn't know whether rent was still accumulating or whether there was, for instance, some other tenant in that property by that point in time. The simple fact is he just missed these damages in his calculation. He didn't do anything to discover them. And for that reason, and he failed to show that he, as Your Honor pointed out, he failed to show that he conducted any diligence. We think for this reason, the court need not even get into the question of hearsay and authenticity with respect to the New York documents, although I note that AIM has really failed to respond to those arguments. We think those documents clearly show that he was on notice of those proceedings. Under New York law, the affidavits of the process server are prima facie evidence of something more than just a blanket denial to negate that prima facie case. But again, I think the court can easily resolve this appeal on the ground that he failed to show any due diligence to discover this category of his claimed damages. If I may move, unless the court has further questions about that first aspect of our appeal, let me just very briefly address the issue of nominal damages. AIM concedes that the court should vacate the nominal damages award. Now, of course, he concedes that because he wants a million dollars on that count and not $5,000 on that count, but it was incumbent on him to offer arguments to the court in opposition to our request to vacate the $5,000 award, and he's offered no such arguments. So we view that issue as waived. With respect to the cross-appeal, I want to address for now just one issue relevant to AIM's cross-appeal, and we think the cross-appeal is clearly barred for all of the reasons that we set forth in our brief. The one issue I want to address is AIM's suggestion that somehow Liberty failed to appeal some aspect of the district court's ruling on the first go-around. We think that's simply wrong. If you look at the district court's initial ruling after the bench trial, there's nothing in that ruling suggesting that the district court was awarding some separate theory of profits on count two of AIM's counterclaim. There's just no suggestion of that in the court's ruling, nor would that have even been proper. The party's contract clearly governs AIM's entitlement to profits. Section 4 of the contract provides that he's entitled to disgorge Liberty's profits only if his ETHs were reinstated by May 8, 2016. Of course, we know that didn't happen. And so that's why the entire issue of profits, both at trial and then on appeal, on the first appeal, was entirely tied to whether that ETH deadline had been extended. This court, of course, held that it had not been extended. And that just extinguishes his claim to any profits under the party's contract. And it's black-letter law that the covenant of good, faith, and fair dealing cannot be used to displace the contractual terms in a contract. That's why the district court did not use the covenant to come up with some other theory of profits that would have been inappropriate. There was nothing for Liberty to appeal. And so that argument is just wrong. Unless the court has any further questions at this point in time, I'll reserve the remaining arguments for rebuttal. Thank you, Ms. Sahara. Mr. Hartnett? Yes, thank you, Your Honor. And may it please the court, David Hartnett on behalf of Greg AIM and his company, Wolf Ventures. As Ms. Sahara just announced, this is the second time we're here. And in the first appeal, in our opening brief, we pointed out that Liberty, in fact, was not appealing judgment on count two of our counterclaim, which was for a breach of the implied covenant of good, faith, and fair dealing. And Liberty responded by saying it appealed count two, but only insofar as it rested on the extension of the buyback deadline. And the reason that's so important here is that count two did not rest on the extension. It was based on a breach that the district court found, in fact, occurred long before the original May deadline. Its explicit finding of fact was that since inception of the PSA, Liberty never had any intention of selling these stores back to AIM, regardless of what he did. And it's undisputed that this aspect of the judgment was affirmed. If you look at the district court's remand order, he, in fact, says- Yes. Can I stop you? Because unless I'm mistaken, I believe Judge Diaz has left us. Oh, I'm sorry. Thank you very much. Thank you. Judge Diaz, I'm not sure at what point you dropped off, didn't know how far back I should go. You were talking about the fact that the concern about the breach of the covenant of good, faith, and fair dealing survived the first appeal. So you can go on from there. Thank you. And as I was saying that the district court, in fact, said in one of its remand orders that all aspects of the judgment were affirmed, except, of course, for the fact that the extension offer lack consideration. And so on remand, when this court said to enter appropriate damages, that left only one question. What were the appropriate damages under count two of our counterclaims, since count two did not rest on the extension? And the answer to that question turns on an issue of law that this court can decide. And that is, does Virginia law recognize disgorgement as a remedy to breach of contract? Counselor, I'm sorry. Just to make- Maybe I wasn't following. I thought the question, at least one of the two questions, was what were the damages on count one? And that's the $250,000 that you all ultimately agreed upon, right? That was one of the questions. You think there was also a second question? You're exactly correct. For this appeal, the remaining questions count two, because you're right. Count one, the party stipulated to what those remaining damages would be. And those are the contractual damages. You're arguing under count two that you were entitled to extra contractual damages, tort-style damages. No, we're not asking for extra contractual damages. We're saying that the $250,000 compensatory damages were for count one, where we alleged failure to pay rent and utilities and failure to reimburse aimed for expenses that he paid. That's what count one was for. And two is for breach of the implied covenant of good faith and fair dealing, which the court found liberty breached by never intending to honor its obligation to sell the stores back. But it's not extra contractual. This is still within, based on that breach. So you agree that count two is limited to contractual damages? And that's the argument here. And so that's the question. When the district court on remit said, my reading, the district court said, it's reading a Virginia contract law is that I can't do this court because that's an equitable remedy, which I can't do on breach of contract. And that is where the district court erred because this court and the Virginia Supreme Court have both said that a plaintiff may be entitled to discouragement as equitable relief for breach of contract. Mr. Hardnett, can you hear me? So just to follow up on Judge Richardson's question, so the parties agreed on the contract damages on count one and the court in the first case. I know you disagree with this, and I respect that. Found that there was no consideration for the extension of the deadline to get even, right? But it was during that period of time, wasn't it, that your client or that Liberty garnered the profits, which you are now trying to disgorge. So it's not clear to me how you can allege a breach of the covenant of good faith and fair dealing based on an extension of a contract that we found to be invalid for lack of consideration. Right, the mandate from this court, as you're correct, said that AIM was not entitled to lost profits that he would have earned based on the extension of the buyback. If the extension was valid, then he would have been able to earn those profits from that tax season and lost future profits. Here we're saying that even though so and we're not disputing that is the law of the case. We're asking for what damages are left from before the extension, and we're saying as an alternative remedy that's still in the contract law, Liberty, the only way he was able to have earned those profits in the 2016 tax season, which through its deliberate and willful breach, the implied covenant of good faith and fair dealing and the court. But the breach, the breach was the failure to honor the extension, which the court found lack consideration. I respectfully disagree, Your Honor. The district court said that the evidence that proved breach of the implied covenant was that since inception of the PSA, Liberty was never going to honor its obligation. The evidence was that right after the PSA was signed in January, Liberty immediately turned around and was preparing to sell the stores to somebody else. And it came very close to doing that before the original deadline and before even the extension of the deadline was even brought up. And so the court said, if you're going to sell those stores from the get go, you obviously were not intending to honor that. And then later on at trial, when we presented evidence that Mr. Ame did get his EFIN before the extended deadline, he got it in September. We said that's ahead of the December deadline. Liberty's defense at trial was not that no, the extension's invalid for lack of consideration. Its defense was that it doesn't matter if he got it or not, because under that paragraph four of the PSA, it's still subject to our discretion whether or not we have to give all the stores back. And the district court honed in on that and said, your treatment here, you're saying that even if he gets his EFIN, you still don't have to sell the stores back? You're going to say he doesn't qualify for our standard of sales and approval process? The district court said, finding in fact that course of conduct both before and after demonstrated that it was never going to honor it, meaning that it made no difference if Ame got his EFIN before the deadline. But Mr. Harden, how does that course of conduct equate to disgorgement damages? I mean, they could say all manner of terrible things about their unwillingness to honor the contract, but the fact remains that after the initial deadline expired, they had no obligation to honor the contract because there was no contract. Right. And the district court's finding was that it made no difference of when or if Mr. Ame got his EFIN. Liberty was never going to honor that regardless. And the Fourth Circuit and the Virginia Supreme Court said that in a breach situation like that where it's deliberate. The focus is on the violator's wrongful conduct. It's not on what the plaintiff did. That didn't make sense because the yes, whatever the intent was may have preexisted may. The district court's finding was that the breach of that was in September, right, when he actually had the EFIN. There was nothing to breach. Right. An applied covenant of good faith and fair dealing. They were never good. They couldn't breach that until September when he had his EFIN. So I think Judge Diaz's point, I take it not to try to co-opt it, is that whatever the intent was at the earliest moment, the covenant was not effectively breached to cause any harm. Maybe it's a causation problem until September. And as we now know, the September that there was no contract. I'm sure I appreciate that. Again, the district court said they breached on right after the PSA was signed. That was the finding. And the point that I want to raise is that think of it almost as an anticipated and just I'm sorry, but that doesn't make any sense, right? You can't you can't breach before a point in time that if the district court said that, I don't understand how that makes sense. It seems to me what the district court intends there is that the intent was at that time, but it wasn't a breach until September. Because there was no reason to do anything until September. The analogy that I have is think of it in the context of anticipatory repudiation, say in February or March, Liberty had come to AIM and said, we know we're going to give you till May 8th. We're just letting you know we're not going to honor that contract. At that point in time, if Liberty had come to AIM, he could have sued right then before the time for his performance came and could have sued for damages. It would not, he would not have had to show that he performed. The fact that they made that repudiation ahead of time would have excused that. The only difference between that. What the damage is, Mr. Hartnett, in that scenario, would they have been the actual lost profits? Because at that point, we don't know what the profits are. If you're saying that that was a total breach, the end of the contract, you get whatever damages you might be entitled to then, but you certainly wouldn't be entitled to any lost profits because none would have existed at that point in time. Right. Which is why we've confined our damages here for pre-extension breach, the profits that they earned before the deadline, during the 2016 tax season, not after. And that equates to how much? Just as in, it was stipulated at trial, the $1.7 million. Both parties agreed that is what Liberty made from profiting from that breach. There's an agreed exhibit on the amount of, at one point, I'm rounding up, it was $1.6 something million. And again, the case that I think is key here, from this court, from 1990, is Eden Hannon versus Sumitomo Trust and Banking. That was at 914 F2nd 556. And the reason I want to spend time on that is because I think it controls here. In that case, the defendant signed a nondisclosure agreement, but then it used the plaintiff's confidential information to outbid it on a contract. The defendant was the first place bidder using that information. Another party, a third party, came in second place and the plaintiff was the third place bidder. The plaintiff sued for breach of contract. The district court issued an injunction that said it couldn't award any money damages because the plaintiff couldn't show any injury. They said, you came in third place. If the defendant hadn't done that, second place guy would have won instead. But this court, citing Virginia Supreme Court law, reverged and said, no, that we can still impose a constructive trust on the profits that the defendant gained. They said, because equitable remedies are available for breach of contract. They said that the remedy didn't depend on whether or not there was actual damage to the plaintiff in that case. It said to focus on the wrongful conduct of the violator, as I mentioned earlier. And importantly, the court in that case, it acknowledged, it says, yes, we know that the plaintiff cannot establish it would have won the bid, but it doesn't matter because we can determine what the defendant's profits were from his breach. Just like in our case, as I alluded to a second ago, we know exactly what the amount of liberty profits were from his breach because that was a stipulated amount at trial. And so, of course, that court imposed a constructive trust on profits when a plaintiff couldn't show damages. Constructive trust on profits is the same thing as disgorgement. That's what we're asking for here. And so, if you apply that holding, aim is entitled to disgorgement of the profits that liberty made from its breach. Again, the focus is on the wrongful conduct of liberty. And it's important because, again, the district court reiterated on remand that the reason liberty didn't sell the stores back was not lack of consideration. It was because, since the inception of the PSA, liberty was never going to sell the stores back. That's the part I think is really worth emphasizing here. And with that, I was going to save the remaining time for rebuttal. As far as liberty's cross-appeal, unless the court asks questions specifically for me, we intend to submit it on the papers because we do believe the district court's analysis was correct. There is more than enough information. May I ask, sorry, something came to mind here that I hadn't thought about. So, as I listened to you, your argument appears to have some facial appeal. But the problem is, now that I remember, is that none of these arguments were presented during the first trial with respect to equitable relief. So, one of the responses that I'm sure you're going to get from your friend on the other side is, this is too little, too late. What's your response to that? We asked for these damages initially in our counterclaim, and then again, disgorgement did not become relevant until remand. We already had a judgment in place on count two for the profits that Liberty Tax earned. It was only on remand that we had to decide whether or not we could still get those damages. And disgorgement is a valid remedy, and Rule 54 allows the court to include that. Whether or not we asked for it in the counterclaim or earlier, it's still a valid way to get to that damages. I don't know if that was clear enough, but Rule 54 is what allows us to do that. Okay. As I was saying, for the Liberties Cross Appeal, we believe the district court's analysis was entirely correct. We don't believe there's any abuse of discretion here. The only other things I wanted to point out that were raised a moment ago during oral argument, Liberties tries to gloss over the fact that there was an agreed exhibit as to damages. Again, think about that. AIM says, yes, to our knowledge, this is all the unpaid rent that's out there. And as we're making that representation, Liberty says, yes, that's the agreed amount subject to Rule 11. We're making that representation to the court. It was receiving notices from the landlord that that, in fact, was not true. There was additional unpaid rent, and it never told AIM about that. There's also evidence on the record that, yes, we asked for it in discovery. We had a motion to compel. Also, AIM had paid rent. Mr. Hardnett, I mean, you seem to be arguing that Liberty was required to make its case for you and your client. That's not true. That's not correct. Well, I'm saying, when we say, is this the correct amount of unpaid rent? And they are knowing, they know for a fact that there's additional unpaid rent out there. They have an obligation, especially when we ask for proof of payment and proof of rent in discovery, they have an obligation both ways to come clean with that. Furthermore, how did you phrase it? So tell me again, how did you phrase the question? The discovery question? Yes. If you allow me five minutes of rebuttal, I will track that down and get the answer. Okay. And again, just think of the context. At the time this rent is not being paid, AIM is suing Liberty for unpaid rent. It is inconceivable that he would have had this knowledge and just sat on it. That's the last thing I'd like to say. Thank you, Mr. Hartman. Ms. Sahari? Yes. Briefly, with respect to our appeal, I just want to clarify one thing for the record. The allegation from counsel that Liberty was receiving notices of the unpaid rent and knew about it appears to be based entirely on the fact that the landlord had attached notices on the door of the property. But counsel conceded at trial that Liberty was no longer occupying that premises after June of 2016. So I don't think that's a fair assumption to draw from the record. AIM was the lessor. He was the one receiving the legal notices from the landlord. And for all the reasons I said before, he did nothing to show any diligence on his part to discover his claim damages. With respect to AIM's cross-appeal, a few points. I didn't hear any response from counsel on the fact that section four of the party's contract explicitly governs AIM's entitlement to profits. I didn't hear any response to the point that the covenant of good faith and fair dealing cannot be used to rewrite the terms of a party's contract. And section four of the party's contract entitles him to profits only if he restored that EFIN by May. Counsel, but counsel implied a covenant of good faith doesn't have to rewrite. The writing is in one's honor. It comes from the honor in the sense that you make an agreement. You have an obligation not to do anything that's inconsistent with accomplishing that. Why do you have to rewrite the ethos of contract under our law in our country? Well, the party's contract provided that Liberty would be required to pay profits back to AIM if he restored his EFIN by May 8th and bought back the business. He didn't do that. But nonetheless, he wants this court to give him all of Liberty's profits that it was earning during that time, even though the condition precedent for him to obtain profits he did not achieve. And so that's what I mean by rewriting the contract. What he wants the court to do is to say there was some breach of an implied duty, and I'm therefore entitled to damages that the contract forecloses. No, the allegation is that your client never intended to do the right thing ever. That's what he said. You never did that. This was just a ruse that you had no good faith when you signed the PSA. That's what his allegation is, not about May going by without getting a certification. It's about you, as he alleged, an equitable remedy, he's saying, is that you were dishonest with him. Not you, your client. I understand, Your Honor. That's his allegation. So why is that temporal to May when that's the whole fear of implied covenant of good faith? When is, if it exists, when does good faith start, an obligation to have good faith? Well, of course, it starts once the contract is in place, Your Honor. But to the extent he's claiming that Liberty never intended to abide by the PSA, that fraud claim has been dismissed and was affirmed by this court. And to the extent the claim is there's some other breach of the contract, some lack of it by selling back the business to AIM. Intent to breach a contract is not a breach of contract. And the breach could not occur until he restored his e-fins and therefore had an entitlement to buy back the business. And that just never happened. Mr. Harria, your colleague on the other side made a point about the doctrine of anticipatory repudiation. And he argued that although that in this case, and piggybacking on Judge Gregory's point, your client made clear either from the get-go or shortly after the contract was agreed upon that they were not going to comply. And I suppose there's an argument to be made. If that's true, then that's a total breach of the contract. At that point, he's entitled to sue for his damages. And he alleges that the damages were the profits that were, you know, that were garnered during the time before the extension was talked about. So can you talk about that? Yeah. So the district court addressed that argument in its first ruling on remand. And what the district court explained is that to award profits at that point in time would be completely speculative, even for the pre-May 8th period, because at that point in time, it was completely speculative whether AIM would have restored his e-fins and therefore entitle him to buy back the business. So even assuming AIM had filed suit, let's say, in February of 2016, his lost profits would not have been an appropriate remedy at that point in time because they were speculative as to whether he would, in fact, comply with the conditional precedent to get profits. So perhaps at that point in time, what he could have done would be to rescind the contract and put the parties back to where they were. But of course, that's not what happened in this case. I'm sorry. Go ahead. Finish your answer. No. Well, I want to just make a few other points with respect to this issue. Well, I thought you were finishing your answer. Can I have a question? Yes, Your Honor. The other points. But the whole idea of the arrangement was to help him or help the company get along while they were in this limbo of not having a certification. And you were a caretaker, if you will. This was really, wasn't it, the whole idea you would keep this going and then hopefully it would get to the point where he could do this and you would give those things back. So even if he got to a point where he never got it, isn't the theory of it that you would still give him those profits? What would it mean? It didn't belong to you, really. Wasn't it the idea? I respectfully disagree with that. Well, go ahead. This was not a bailment contract. This was not some kind of caretaker contract. This was a sale. The PSA stands for Purchase and Sale Agreement. I understand that. Ames sold his business to Liberty. There was a condition precedent in the contract for him to buy back the business, subject, by the way, to Liberty's sales and approval process. And that condition precedent was that he restored his events by May 8th, which he failed to do. And I just think it would be a gross kind of- If he could buy back based on what were the payments? What was the money coming from for the buy? Did the profits have anything to do with the purchase money? Well, if Ames bought back the business- That's a simple question. Yes. It's a simple question. If he bought- Sorry, Your Honor. Did the profits have anything to do with the substance of the purchase money? No, Your Honor, except that if he bought back the business under Section 4, then he would be entitled to have Liberty's profits returned to him, subject to some exclusions during the period, the January to May period. But his ability to obtain those profits under the contract was expressly conditioned on restoring his event by May 8th. I think it would be a perversion of equity to give him profits that he is simply not entitled to under the contract. And he has cited no case from Virginia or the Fourth Circuit that awards a disgorgement style- Yes, Your Honor. I see your hand raised. Chief, can I- Yeah, sure, sure, sure. I'll just ask the question. So he said, this is where I wanted to get you to at some point. He says there's this Fourth Circuit case, the three bidders on a contract case, that supports his conclusion that disgorgement is a remedy for breach of contract. When I heard the argument at first that disgorgement was a remedy for breach of contract, I felt my contract professor roll over in his grave. So help me understand. That was a surprising theory to me. Why is that case, which I've read and I'm sure you have, why do you say that it doesn't support his argument and it doesn't tell us that Virginia novelly permits disgorgement of profits as a remedy for a breach of contract? Sure. So the principal case that he relies on is the Ian Hannon case, which is a case of this court. And that case limits its holding to cases of non-competes. And non-competes are a special kind of contract where obviously one party agrees not to compete with the other. And in that particular circumstance, because the damages can be difficult to ascertain in that circumstance, courts have imposed constructive trust on the parties who breach a non-compete. But the court was clearly talking squarely about non-compete contracts when it was talking about disgorgement as a possible remedy. He has cited no other case from Virginia or from this court involving disgorgement as a remedy for contract. He cites two Law Review articles in his brief. If you look at those articles, they make very clear that this is a novel theory of contract damages. And I think it would be inappropriate for this court to adopt such a novel theory of contract damages without any indication from the Virginia courts that it would do so. Particularly when he didn't raise this theory of damages. He didn't raise it at trial. He didn't raise it on appeal. He didn't even raise it on remand. He raised it for the first time in a Rule 59e motion for reconsideration. And it is a black letter law that motions for reconsideration are not vehicles for raising new novel theories of liability or damages in this case that a party never raised at any point before then. But counsel, isn't your response to Judge Richardson the very reason why maybe it should be? This is unique, although this is not a non-compete. This is a case where it's very difficult to deal with disgorgement. There's sort of a situation where two companies are sort of working together in this formation of this PSA where they're operating and then the profits, if you do what you're going to do, say, you get these profits back. Because under your theory, you need some equitable way to deal with because he would have no, their company would have no chance of any kind of breach as long as you could say, well, you never got your interests back. You never got your authority back. So you can't do anything. So there are no damages ever because it would never rise until you get that. And, but that's the question almost like, seems more like maybe unjust enrichment more than disgorgement perhaps in terms of equitability that's parallel to a contract that you were unjustly enriched because he claims that you never intended to do anything but to keep these profits from him. That's his whole theory. And that's the whole idea. It's very difficult to discourage him because you would say, well, you never got it. So whatever we did to you during the process, you have no remedy. If we breach, there's no remedy because you've never got that back. And that's the whole point. It seemed to me that PSA was intended that everybody was hoping and intending that he would get that. I mean, isn't that, isn't it there? That's why in like the case that he cites in the fourth circuit discouragement, it was appropriate there because it's hard to figure it out. As you explain. Yeah, I respectfully disagree, Your Honor, for several reasons. You disagree, but with your explanation of Jed Richardson, the same parallel for why you explain in a way why that's an off case, it should only be held to those narrow circumstances. Don't you look at the reason behind it and the reasons you gave seem to me parallel here. It's difficult to determine what the profits will be. It's difficult to determine how far in, because the whole theory is that the case is that you never intended to do the right thing. You've never had a heart of honesty at all. That's his whole theory. That is his theory, but section four of the party's contract, it is the contract. He agreed to section four of the party's contract and section four does not allow him to obtain profits. Unless he restored his e-fence, which he didn't do. So unjust enrichment, crystal clear, can't be used to override a party's contract. And that's not the claim we have here. He didn't bring an unjust enrichment claim. Breach of the covenant of good faith and fair dealing cannot be used to override the party's contract. It's not even its own claim under Virginia law, but even if it was, it can't be used to override a party's contract. Ms. Zaharia, can I ask a question and perhaps make a statement? So this is piggybacking to what Judge Richardson talked about earlier, I think, when discussing this case with your colleague. If your client had done nothing, said nothing about its intent, and I realize that you dispute whether or not there was an intent to just treat this as a worthless piece of paper, the contract as the district court judge seemed to suggest, but if it had done nothing and simply waited for aims to perform or not, I don't think there'd be any question about the entitlement to any equitable relief. So I guess it just, it strikes me that there's an issue of causation here and whether or not, you know, as you pointed out, the fraud claim in this case was dismissed the first go around. Judge, the district court judge, in this most recent opinion, seems to have had a little bit of buyer's remorse and seems to be suggesting now that he wished he might've stated more expressly that your client never intended to honor the contract. That may make out a fraud in the inducement claim, but that was not what the findings were below the first time around. And now we're relitigating issues that have been litigated and resolved. And so I just get back to the point. I mean, irrespective of what your client may have done or said, the fact of the matter remains that Mr. Ames didn't comply with the requirements of the extension. And it just seems like we're trying to fit a, you know, a square peg into a round hole and it just doesn't seem to fit. But anyway, that's not a question. It's more of a statement. I'll just say I agree with that statement, Your Honor. We're here, frankly, because Ames is not satisfied with this court's prior ruling. Frankly, the district judge, you know, expressed his dissatisfaction with this court's prior ruling, but it is the law of the case. He didn't restore his EFIN and the parties did not extend the deadline for doing so. And to award him profits that he clearly is not entitled to under the party's contract, I don't think is a fair equitable remedy in this case. Thank you, Your Honors. Thank you, counsel. Mr. Harknett, do you have a rebuttal time? Yes, thank you, Your Honor. Just as to Liberty's appeal, Judge Diaz, I searched, I don't have, I have a paraphrase of our discovery request. It's found on JA 491 to 92, where we asked Liberty to produce all documents regarding rent at the stores in 2016. That was the allegation. Getting back to... Would that request, counsel, include non-payment of rent? I mean, the point is, as I understand it, they gave you the documents where they were paying rent. If you ask for all documents about rent, they gave you the ones where they paid the rent. But to ask for non-payment seems like the inverse of what you were asking for. They did not give a complete production, and that's why we filed a motion to compel. The district court never heard that motion. Right, but they also didn't, they didn't file, for example, they didn't give you documents related to, you know, payments of rent here in Columbia, South Carolina, right? Because they're not paying any rent in Columbia, South Carolina, I presume. So, like, the non-pay, I mean, to prove a negative, when you ask a document request, you don't get a listing of, oh, and these are the things we're not doing. You get the list of the things that they've done. Right, and we didn't get an answer either way on that. Again, under the PSA, Liberty was solely responsible after January 21st, 2016, for paying rent at all of these stores. After January 2016, Liberty was the only party in possession of these stores. The evidence is that Liberty had banned Mr. Ame from entering the stores for any reason. Liberty was in possession of the store when these notices were being posted at the storefront. We think that if we, the idea is that evidence related to rent, that would have been responsive to that and related requests. Not just what rent are you paying, but if you're getting a notice from a landlord not paying rent, we feel like you have an obligation to come forward with that as well. And so your theory here turns on the assumption that Libert Corporate got the notice off the door and then refused to turn it over to you. That's correct. Again, Liberty was the only one in possession. It had the only obligation to pay this rent and it never notified him that it wasn't being paid. And again, this is at the time where we're suing him for unpaid rent. Liberty's appeal is suggesting that we somehow received this notice and sat on it when that, as the district court said, that makes no logical sense at all. Can you talk a little bit about what evidence you put in of your due diligence, other than at least allegedly this one document request? So I understand you said, I didn't know about it, and I don't know from your perspective, but your client didn't know about it. But what evidence, where can I find in the record evidence that you put in of your due diligence where you did anything affirmative to find this information? Right. And again, it assumes that we had an affirmative obligation when in fact, under the PSA, it was Liberty's obligation to pay rent and to indemnify AIM for any liability. Accept my assumption and go to the question instead of fighting the question. The question is, what evidence did you put in to show that you engaged in due diligence? Again, fine. I just want to make sure I've looked at everything in the record. Right. Again, the evidence is that Liberty's paying rent and AIM did not receive a notice from either Liberty or the landlord that rent was not being paid. So the due diligence, they're like, he had no reason to question whether or not rent was being paid at that store. It had been paying on that store throughout. All of a sudden it stopped paying, but no one told him. So why would he have any obligation to contact the landlord just to confirm payments were being made as before? It's almost like there needed to be something that triggered him to act on this. And there was never anything until he discovered after the fact that the judgment had been imposed against him. Mr. Harder, can you tell me very succinctly and hopefully briefly, what exactly would you say the evidence that you have that Liberty never intended to fulfill its obligation on this contract? Right. Liberty manifested that the very same day it signed the PSA. As soon as Mr. Amos signed the PSA, Liberty had another person submit an application to purchase those stores. The district court finding effect lay out all the steps that were involved. He had to go through, he had to get his own EFIN. He had to pass audits. He had to do several other things. And Liberty was checking the box. And even in March, as they were preparing to sell these stores, they said, understand that if we sell the stores to you, we are not going to let Mr. Ame buy these stores, regardless of whether, regardless of his EFIN status. That is in a written email to this purchaser. They were dealing with third parties in a way that clearly was contrary to the intent and the mutual promises of this contract, correct? Correct. OK, go ahead. Anything else? No, again, council brought up the fact that it'd be a perversion of equity for Ame to have this money. But in fact, the district court said that Liberty was the one that displayed bad faith throughout. And he took the time to point out that Mr. Ame acted in good faith throughout, that he did nothing wrong and that the only reason he didn't finally get his EFIN due to circumstances beyond his control to the idea that perversion of equity would work against Liberty is simply wrong. You have anything else further? No, your honor. All right. Thank you, council, very much. To both of you, regret that we cannot fulfill our normal tradition of shaking hands. But even though we're in this virtual setting, please know that the spirit is the same and we appreciate so much your argument. And thank you so much and be safe and stay well. Thank you very much. Thank you, your honor. You too. Thank you all.
judges: Roger L. Gregory, Albert Diaz, Julius N. Richardson